Good morning, ladies and gentlemen. Our first case for argument this morning is Unite Here v. Magnificent Mile Hotel Management. Mr. Gaspitz. Thank you. Good morning, Your Honors. May it please the Court, I'm Irvin Gaslitz and I represent the Defendant Appellant, Magnificent Mile Hotel Management LLC. The lower court here erred in two ways. First, there was a bona fide dispute between the hotel and the union over the fairness of the way in which the arbitrator had been selected for a grievance, which led to impasse. Section 5 of the Federal Arbitration Act provides that where there is such an impasse, the role of the court is to break the logjam by appointing an arbitrator. The district judge refused to do so and instead ruled that the hotel had to proceed before the arbitrator whose appointment it had contested. That was error. The second error was when the lower court affirmed the disputed arbitrator's award. The case was a layup. The hotel had a zero-tolerance policy for any kind of violence or physical intimidation or for carrying weapons in the workplace. A security video captured the incident. It clearly showed the grievant pulling out a knife, snapping it by his wrist to open it, and holding it open as he approached an elderly female co-worker. The arbitrator nonetheless overturned the discharge. Why? Because the employee had what he called a goofy grin on his face. So he had no intent to harm. I'm going to stop you and ask, because you know, of course, under your theory, what would stop a party from waiting to see which arbitrator is chosen, then object to the process and run into court claiming that there was a lapse, and ask the court to choose a new arbitrator? Well, my answer to you, Your Honor, is that in this case, there was a bona fide good-faith reason why there was a dispute, and furthermore, the hotel immediately, before having a decision from this arbitrator— I think you'll want to address the whole panel. Okay, I'm sorry. I'm looking at— The screen is not where Judge Ropener is. Okay, sorry. So in this case, there was a legitimate beef with the way the whole process took place, and I would submit that the court— this court has instructed that when you have such a dispute over the selection of the arbitrator, then you immediately bring it to the attention of the court, which is what happened here. This wasn't a situation where the party waited until they got the adverse decision to do that. So I think that that was addressed by the court in one of its decisions about how a party should do that, and that's the WellPoint, Inc. v. John Hancock Life Insurance Company. And can I confirm, are you appealing—we have two different judges here. Are you appealing the original judge's ruling where the court granted the motion to compel arbitration and address the selection? Are you appealing the—I think it was Judge Perry—the subsequent judge's decision where you essentially moved to reconsider, it seemed like? Well, the first judge's decision could not be appealed. It was an interim decision. She stayed the case. I understand you couldn't appeal it immediately. I'm just trying to confirm exactly what you're appealing today. We're appealing both decisions. It was submitted to Judge Perry to reconsider. She just followed what the first judge did. And then we also presented to her why the decision was against public policy and shouldn't have been confirmed. How do you get around the arbitrator's factual findings about the knife incident here? We give—we essentially don't touch factual findings of arbitrators. It's virtually impossible to do that. And it seems you'd have to prevail here on your public policy argument. We'd have to ignore those factual findings. You disagree with them. I understand that. But we'd have to ignore them. And how can we do that? Well, in this case, Your Honor, which is very unique, in none of the cases that the union cited do we have a video footage of the entire incident showing what happened. And this court in the Kojecki case, which we cite in our reply brief, stated that we're not going to ignore what the video shows. So in this instance, the court can see the video for itself. Mr. Kessler, are you really arguing that any time there's video that we can ignore the longstanding precedent about when courts can review arbitration awards and simply make our own factual determinations? You know, I may think that the arbitrator was completely wrong in his decision in this matter. You know, he obviously had no idea how a woman would feel if a man walked toward her with a knife drawn with that look on his face. But, you know, no matter how right or what I think, the parties bargain to have your dispute settled by an arbitrator. And you can't come back out of that bargain and have it decided by the court. I'm sure you've taken a look at quality custom distribution, and it's a problem for you. Well, Your Honor, I would answer that by saying matters of public policy are for the court to decide. And when an arbitrator's findings may be contrary to that public policy, then it cannot be confirmed. In what sense contrary to public policy? If the hotel had decided to keep this man on the payroll, would that have violated Illinois law? Well, it may have been contrary to the Illinois Workplace Violence Prevention Act. It's a simple question. If the hotel had decided not to fire this man, would that have violated Illinois law? It's questionable, Your Honor, because the employee had a right under the Illinois Workplace Prevention Act to not have a disability. So the hotel could have been prosecuted and convicted of what? Not convicted, but could have been sued by the employee. Anyone can sue about anything, right? We could have been sued is no response. Do you have some Illinois case saying that in a circumstance, anything remotely like this, the hotel must, legally must, fire the worker? I cannot give you a case that says that, Your Honor. I don't think there is one. And then you have the problem, which is that the arbitrator is effectively the party's delegated agent. Any decision the hotel can make, the arbitrator can make on its behalf. So if the hotel would not have been in violation of Illinois law, how was the arbitrator in violation of Illinois law? Well, the way the arbitrator is in violation of Illinois law is that he had to consider, as part of the public policy duty of the court, he had to consider the issue of reinstatement. Would the person's reinstatement have harmed the workforce or possibly created a situation where there could be a future harm? But that's where the factual findings come in. He made specific factual findings, and not just based on the video, but based on the fact that the hotel knew this employee came and carried a knife. He'd been a good employee for 30 years. So the arbitrator made pretty detailed factual findings here that, in order to go down the route you're proposing, we would have to question those or find that they're wrong. I would say that he didn't make any findings about whether this person would be a safety risk to the workforce by being reinstated. And that's the problem. He didn't express contrition. He had done this before. Whatever he had done with previous employers, you have to remember this employer came on the scene at the end of 2022. And there was nothing to indicate, nothing in his decision to indicate that he took into consideration what this meant, reinstatement meant for the workforce. And therefore, that's for this court. This court can look at that and say, you haven't done it, and we don't think there was anything in the record that's satisfied there. There was one Illinois Supreme Court case that said the arbitrator has to address that. And if he doesn't, then you don't defer. Does the court have any questions with respect to the… Let me rephrase my question. Okay. Suppose instead of taking out a knife, the employee had come up to the other worker and just frightened her, said things that frightened her. Would the hotel have been required to fire him, legally required to fire him? I can't answer your question unless I knew exactly what it is he said. If he said, I'm going to kill you, that would be one thing. Suppose he comes up to her and says, I hate people who are, and then he names her ethnic group or sex, makes a scowling face and walks away. That may not have been a situation like this one. I'm not asking whether it was a situation like this one. There is a public policy against insulting and frightening workers. There are all sorts of public policies. The situation I'm giving is one in which the frightened worker would have been entitled to collect damages for defamation, for the insult, for the fright. Does that entitle, sorry, does that require the employer to fire the other worker? It's not does it entitle. It's does it require as a matter of Illinois law. I can't say whether it requires, but I can say this, that the policy here was a zero tolerance policy. The contract gave the right to the employer, the hotel, to determine the appropriate discipline because it was zero tolerance. We're not asking about the hotel's policy. Your argument is one about the public policy of the state. And presumably you can find that by looking in state statutes or decisions of the state courts. So I'm asking, does the Illinois judiciary require an employer to fire the worker in the kind of circumstances I've outlined? And as I said before, the statute doesn't directly say that. Does some Illinois case say that? I cannot point you to an Illinois case that says that. Your Honor, I don't mean to cut you off, but I'm running over my rebuttal time. Thank you. Thank you, counsel. Mr. Kennedy. Good morning, mate. Please, the court. Pardon me. I'm Wesley Kennedy representing Plaintiff Appellee Unite Here Local 1. Arbitration is a matter of contract. Under federal arbitration policy and under federal labor policy, parties enter into arbitration agreements and we enforce them. In this case, the parties had a contract to select the arbitrator by random drawing from a standing panel of arbitrators without any exception or any restriction on the same arbitrator getting two cases in a row. An arbitrator was selected. The employer didn't like that arbitrator in this case. The employer has said in the meeting, and it says in its brief, we would have accepted this random selection process if it excluded that arbitrator from the pool. So the real beef is not with the process. It's with the arbitrator who is part of the standing panel under the contract. The first question on the first issue, the question before the court below, was whether to exercise its authority under Section 5 of the Federal Arbitration Act to ditch that outcome and select another arbitrator. Well, the first clause of Section 5 is clear. If in the agreement provision be made for a method of naming or appointing an arbitrator, such method shall be followed. So the question before the district court was, had the arbitrator been selected by random drawing in accordance with the CBA? And the court properly said, yes. The random number generator is random. It doesn't use seed numbers. It doesn't use algorithms. It is not subject to manipulation. The union didn't know how it worked internally anyway, so the union couldn't have manipulated it if it wanted to. And even the authorities cited by the defendant in its brief recognized the randomness of this process. In its brief, the employer says, well, this isn't a drawing under the contract. Well, that wasn't argued in the district court, so it's not properly before this court. At any rate, the use of the random number generator is a drawing. It's a drawing good enough for the Illinois Lottery to do its daily numbers drawings by random number generator. So what the company is essentially asserting is that they want the right to rewrite the panel of arbitrators in each particular case or arbitrator. And the tell, again, is that their real objection is to the arbitrator, not to the process. So that really ends the conversation under the first question. There is no lapse under Section 5. Asserting a lapse where the arbitrator has been selected in accordance with the contract would be contrary to the language of Section 5, the first clause. It would also be contrary to the rules of statutory construction. The employer asserts the right in any case for any reason to say, I don't like this particular arbitrator selection. I refuse to participate in the process. And that creates a lapse requiring the court to intervene. That's an absurd result. You shouldn't read the statute that way. And it would also eviscerate the bedrock principle of labor arbitration policy, which is that arbitration is a matter of contract. The employer's interpretation of Section 5 would allow any employer any time to walk away from its contract on the arbitrator selection. The defendant has not cited any case in which a court appointed an arbitrator under Section 5 where the only objection was the employer didn't like the outcome of it, didn't like the arbitrator. Mr. Guestowitz referred to the Wellpoint case in his argument. The Wellpoint case, there was a process in which each party selects one arbitrator and then there's a third arbitrator selected. In that case, one of the arbitrators quit. And instead of permitting the parties to appoint a new arbitrator, which is what the contract said, the arbitrators appointed their own third arbitrator. So that case does not apply. The employer asserts that there is a disagreement on the method by which the random process was carried out. It's mostly based on pejorative name calling against the union. There's no indication that the union did anything but in good faith apply the random number generator in the same way that it applies it under multiple contracts providing for the same language without any objection. Is that a method that the union frequently uses? The union has at least eight agreements with hotels which provide for the same random drawing selection from a standing panel. In each of those cases, the union uses random.org in every case. And this is the first case in which any employer has any objection. Does anybody analyze these choices over time to see whether they're actually random? I don't know the answer to that question, Your Honor. Well, there's certainly no evidence in this record. There's certainly no evidence in this record. And the declaration of the person who administers this process is that there are cases where the same arbitrator gets picked two times in a row. There's no value from experience under these contracts if that's true. And nobody has ever objected. And if they wanted to have a different process for selecting a party from a standing panel, the parties could bargain that. But they didn't in this case. The employer's real argument about the unfairness of the process relates to one reference to the word striking in one email. The contract doesn't say alternate strike. The contract says random drawing. They had the contract. That reference was in a different email chain. In response to that email, the employer said, well, no, we want to have a grievance meeting, which the union did. And then afterwards, there was a new course of communications which led to the selection of the arbitrator. And again, when they got to the meeting, the Zoom meeting, to select the arbitrator, the employer representative said, if you'll take Peter Myers out of the pool, this is okay. So the real beef is with the selection of the particular arbitrator. So there's no basis for the court to find that there was any basis for the district court to get past the first sentence of Section 5, which is to enforce the contract. On the second issue, I can tell that I don't have to go through in too much detail the standards. The review of the arbitrator's award is subject to the very broad deference under federal arbitration policy. So long as the award draws its essence from the agreement, so long as the arbitrator is even arguably construing or applying the contract, then the arbitration award is valid, even if you disagree with it. The arbitrator has particular breadth of discretion in fashioning the remedy in a particular case. And most importantly for this case, as you've already anticipated, the court has no authority to review the factual findings of the arbitrator. Under the D'Nisco and the Garvey cases, the court may not revisit the arbitrator's findings of fact. How an arbitrator chooses to weigh the evidence before him is not a matter for the courts to re-examine, even if improvident, even if silly. Silliness is the legal standard. Arbitrator Myers heard all the evidence, looked at the surveillance video, and made detailed findings of fact. The knife wasn't a switchblade. The grievant didn't brandish the knife. The grievant didn't intend to frighten the coworkers. The grievant held the knife for a split second and then put it away immediately on request. The grievant didn't know that the knife might have been illegal, and in fact he had carried it around in the workplace for years with the employer's knowledge. The police came, but the police took no action against the grievant. And the arbitrator found that the grievant... No action? I thought they confiscated the knife. Well, I think they took the knife. And there is a one-page report... Choosing something is certainly action. They did take the knife, but there were no charges. There was no report of some alleged violation of some municipal code provision. There's a report that says, yes, we came and we saw the grievant. That's in the record. And in any event, the arbitrator found... The arbitrator found that, among other things, that the employer had condoned this conduct, carrying the knife around for years. Those are all factual findings based on an examination of the evidence. They are unreviewable by this court. The court has to take them as it finds them, even if you disagree with them, even if you think they're silly. Now, Mr. Guest would say, well, this case is different because we have the surveillance video. Well, no, it's not different. The surveillance video is a piece of evidence. Like everything else, the arbitrator looked at it. The arbitrator entertained arguments about it. The arbitrator made findings of fact about what's on the surveillance video. Those are factual findings that the court has no authority to review, even if you think he's wrong. But he's not wrong. Both parties have looked at the 20 seconds of the surveillance video. The arbitrator looked at the 27 seconds of the surveillance video. Two district courts have looked at it, and nobody agrees with the employer's characterization of the video. So the arbitrator's factual findings, which really are the core of his award, have to be accepted. There's an assertion that, well, the arbitrator didn't consider the risks of reinstatement. That's really all wrapped up in the factual findings, that the arbitrator found the facts that he did, and on that basis, there was no reason to believe that, particularly if the grievant understood that he wasn't supposed to bring the knife back, that there was no reason to believe that there would be any harm to the workforce if the grievant was reinstated. And the union represents the workforce. And the... Oh, dear. Uh-huh. Judge Robner. I am so sorry. Okay. We're all set to go. Mr. Kennedy. Okay. Thank you, Your Honor. To go back to the police report for a moment, the arbitrator did make a specific factual finding about the significance of the police coming in the police report. He said, in this arbitrator's experience, this is by far the foreshortest police report I've ever seen. It has numbers, the time, assignment number, and beat, and states that after the incident, not a criminal, a non-criminal person, referred to the grievant as a non-criminal person, the police did confiscate the knife, but there were no criminal charges. It was arbitrary. Back to the issue of reinstatement, which I was discussing when we lost Judge Robner. As I said, that's all wrapped up in the arbitrator's factual findings, and implicit in that, at least implicit in that, is a consideration of the merits of reinstatement. And reinstatement is an issue that arises in every discharge arbitration where the union prevails. The question is, should reinstatement be the remedy if there's no discharge? And arbitrators consider and interpret and apply that standard every day on all kinds of issues. And the arbitrator's assessment of the remedy in this case is frankly right down the middle of the fairway in remedies. In discharge cases, reinstatement would make whole relief. In this case, the arbitrator found that some discipline was warranted, so he adjusted to make whole relief on that basis. That's a perfectly appropriate remedy. The court drew its essence from the agreement. The arbitrator interpreted and applied the just cause standard, which is written in the contract. That is the gold standard of standards in discharge arbitrations. It's in thousands and thousands of collective bargaining agreements, and arbitrators interpret and apply it every day. And you can see at page 52 of our brief, this court has affirmed numerous arbitration awards issued under the just cause standard. Mr. Guestowitz makes reference to a zero tolerance policy. Employers implement zero tolerance policy. The employer's unilateral policy isn't in the contract. What's in the contract is just cause, which is a different question and a broader question that the arbitrator interpreted and applied in accordance with his authority under the labor laws. So there's no basis within the standards of the contract to find that the award was in any way invalid as a matter of interpreting and applying the contract. Now, counsel, an arbitrator cannot order a party to violate state or federal law. So the question is, does any Illinois law prevent, any Illinois law or decision, prevent the hotel from employing this man following his use of the knife? No, and to the contrary, as you obviously know, the public policy exception is, even if a kind of... I'm not asking about the public policy exception at large. Okay. I'm asking a concrete question. It seemed to me that the lawyer for the hotel had not researched this question. He didn't know one way or the other when I asked him. Have you researched this question? Yes, and it's in our brief. Mr. Guestowitz makes reference to the Illinois Workplace Violence Act, which is a statute, and it does state Illinois policy, but Mr. Guestowitz can't find a case that finds that under the public policy exception, that statute overrides an arbitrator's award. I'm not asking... Look, I want you to listen carefully to what I'm asking. I'm not asking about arbitrators. Forget about arbitrators. Would it violate Illinois law for the hotel to decide on its own to retain an employee under these circumstances? No. We cite two cases in our brief which rejected the Illinois Workplace Violence Act as a basis for applying the public policy exception. The University of Chicago versus Teamsters Local 743 case, in which the arbitrator found, as a fact, that the employee had repeatedly made physical threats against their supervisor. Notwithstanding that factual finding, the arbitrator reinstated the employee and the employer asserted the public policy exception under the labor laws, and that was rejected by the district court. The second case is the Central Management Services versus AFSCME case, in which the employee used profanity, called the supervisor names, attacked the supervisor physically, causing physical injuries, and was criminally charged with battery. The arbitrator accepted all of those facts, reinstated the employee... Thank you, counsel. But I hope I was clear. I am not asking about arbitration cases. Thank you very much, counsel. No, but the answer to your question is no. Thank you very much, Your Honor. Mr. Kessler, anything further? Yes. I'd like to remind the court that if the arbitrator was not properly appointed here, then the whole issue about what the arbitrator did becomes moot. And there's one thing here that's in the record that really is a matter of no dispute, and that a bona fide deadlock had occurred. And there was a good reason why the employer did not accept disappointment. First, although the CBA calls for the selection of the arbitrator by random drawing, the parties never used that method. In this instance, the union's email agreeing or inviting Mr. Ward to a meeting to select the arbitrator said it would be by a striking process, i.e., alternate striking of names. Mr. Ward attested that he was okay with this because that would mean no thumb on the scale. In short, there was an agreement to use a striking mechanism. But how can that trump the contract? Because the parties can always choose another method of doing it. The fact that it says random drawing in the agreement doesn't change it. And furthermore, the hotel, in this instance... Are you saying that one party can do this? I'm sorry? One party can just change it? It wasn't one party. It was acknowledged that that's the way it was going to be done. That's what Mr. Ward felt was going to be happening. When he went to the Zoom call with the union representative, he was confronted. He was blindsided, as he termed it, with what she described as a web-based number generator. He attested he knew nothing about that generator, how manipulable it was, or whether it was truly random because it was computerized. He did offer to compromise by letting her use the number generator if Peter Myers' name was left off. But that was because Myers had been unilaterally appointed to an arbitrator in a case that was then pending on subcontracting. Did you make the argument you're making now before Myers was selected? Before he was selected? I mean, you're saying that the random number generator is not in fact random. Well, that was how it was perceived by Mr. Ward when it took place. Do you have any evidence to that effect? Of what, that it's not? That it's not in fact random. Well, we cited in our brief that since it was a computerized system, computer methods by definition are not random. They're pseudo-random. Do you have any evidence that it produces results that are not random? Your Honor, I'm going to answer your question by saying that what matters is what happened here. He did not know anything about it. I think the answer is no. Thank you, Counsel. The case is taken under advisement.